Gerald **DONATO, Joan Donato, Michael Donato and Theresa Donato, Plaintiffs,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., James P. DiDomenico and James Donato, Defendants.**

No. 86 C 9740.

United States District Court,
N.D. Illinois, E.D.

June 22, 1987.

Thomas Wolf, Mezzullo McCandlish & Framme, Henry A. Conner, Jr., Richmond, Va., Max Wildman, Cal R. Burnton, Wildman Harrold Allen & Dixon, Chicago, Ill., for plaintiffs.

Robert C. Rice, James E. Farnham, Hunton & Williams, Richmond, Va., Peter R. Sonderby, Janet L. Reali, Chadwell & Kayser, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This is essentially a securities fraud suit, alleging violations of the 1933 Securities Act, 15 U.S.C. § 77q(a) (1982), the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982) and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (West Supp. 1987), as well as various pendent common law claims. Plaintiffs Gerald Do-

nato, Joan Donato, Michael Donato and Theresa Donato bring this action against Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"), a broker-dealer of securities, James P. DiDomenico, a vice-president of Merrill Lynch, and James Donato, Michael Donato's son. Currently before the Court is the motion of defendants Merrill Lynch and DiDomenico to dismiss or stay this action pending arbitration. For the reasons noted, the motion is granted in part and denied in part with leave to amend.

### Facts [1]

Michael Donato ("Michael") opened a securities account with Merrill Lynch in the early 1960s. From approximately 1965, DiDomenico was Michael's broker at Merrill Lynch. To induce him to use their services, Merrill Lynch and DiDomenico represented to Michael that they would handle his account just the way he wanted it handled, that they would give him good advice, and that he could trust them. DiDomenico developed a relationship of trust with Michael over the years. DiDomenico frequently gave advice and information to Michael. Sometimes, but not always, Michael relied on this advice and information.

Over the course of more than twenty years, Michael, following largely his own investment strategy, built up his stock portfolio from a few thousand dollars to more than one million dollars. During the course of their many years of dealing with Michael, Merrill Lynch and DiDomenico came to know very well Michael's investment philosophy and strategy. This philosophy and strategy consisted of buying the stock of large corporations which had fallen very low and then holding on to that stock. Because this strategy meant relatively infrequent purchases or sales of stock, the account generated comparatively few commissions for Merrill Lynch and DiDomenico.

In 1983, Michael told DiDomenico that he wanted to make sure that his stock would pass directly to his children upon his death, that he wanted each child to have access to a small portion of the stock now, and that he wanted the stock given to each child to be returned to him in the event that the child (and child's spouse, if any) died before he did. He asked for DiDomenico's advice on how best to accomplish this purpose. DiDomenico advised Michael that the best way to accomplish this goal was to transfer all of Michael's stock to four joint accounts with right of survivorship. Relying on this representation, Michael did transfer all of his stock to four joint accounts with right of survivorship during the period May to July 1983. The largest of these joint accounts had a net value of approximately one million dollars and was referred to by DiDomenico and the Donatos as the "main account." The second joint account (Gerald's account) was in the names of Michael, Gerald (Michael's son) and Joan Donato (Gerald's wife) and had an initial value of approximately $100,000. The third joint account (Theresa's account) was in the names of Michael, Theresa (Michael's daughter) and Ann Donato and had an initial value of approximately $100,000. The fourth joint account (James' account) was in the names of Michael, James (Michael's son and a defendant in this action) and Ann Donato (James' wife) and had an initial value of approximately $100,000.

When DiDomenico set up the joint accounts, Michael asked him to send statements for each account to each person whose name was on the account. DiDomenico falsely represented to Michael that this was impossible. Michael therefore had all of the statements sent to himself. In late 1983, Michael planned to do extensive traveling. He again asked DiDomenico if

---

**1.** For purposes of a motion to dismiss for failure to state a claim, the Court takes all the well-pleaded allegations of the complaint as true and views them, as well as all reasonable inferences therefrom, in the light most favorable to the plaintiff. *Ellsworth v. City of Racine*, 774 F.2d 182, 184 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986).

Furthermore, the motion to dismiss should only be granted if it appears beyond a doubt that plaintiff can prove no set of facts which would entitle him or her to relief. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

the account statements could be sent to all whose names were on the accounts. DiDomenico again falsely represented to him that this was not possible. Therefore, Michael asked to have all of the statements sent to his son James Donato.

Although plaintiffs did not learn of this until after July 22, 1986, DiDomenico and Merrill Lynch had dealt with James Donato several years before. They had been broker-dealer for James when he lost most of his and his wife's life savings (between twenty and thirty thousand dollars) in one year gambling on options.

In or about January 1984, with full knowledge that James was a compulsive options gambler and knowing that only James would be receiving the account statements and confirmation slips, DiDomenico allegedly encouraged James to buy options in the main account. In order to accomplish this unauthorized activity, James, with the knowledge and assistance of Merrill Lynch and DiDomenico, forged plaintiffs' names on legal documents. DiDomenico did this with full knowledge that Michael did not want James or anyone else to trade in the main account, that the proposed transactions were unauthorized, and that if Michael had known of the proposed transactions he would never have approved of or authorized them. Thereafter, with DiDomenico's encouragement and direct assistance, James began regularly buying options in the main account.

Over the period January 1984 to January 1985, DiDomenico continued to encourage James to make unauthorized purchases of options in the main account and also assisted James in making unauthorized sales of stocks in the main account. Apparently, James needed more money to finance his compulsive options gambling, so with the assistance of Merrill Lynch and DiDomenico, James forged the names of plaintiffs on the accounts he was not a signatory to, authorizing the transfer of funds and stocks from the smaller accounts into the main account. During this period, defendants conducted more than one hundred unauthorized transactions in plaintiffs' various accounts.

As a result of these unauthorized purchases of highly speculative options and as a result of their unauthorized sales of stocks to finance the options purchases, defendants lost all of the money and stocks in all the joint accounts.

In order to conceal this unauthorized activity over the 2½ year period from January 1984 to July 22, 1986, DiDomenico made sure that all account statements and confirmation slips for the over one hundred unauthorized transactions went directly to James and not to any of the plaintiffs, although the accounts were in their names. Additionally, on the two occasions during this period that DiDomenico talked to Michael, he gave deliberately misleading responses to Michael, which responses were intended to make Michael believe his accounts and the money in them remained intact. Because of the defendants' intentional effort to hide their actions from plaintiffs, plaintiffs did not learn about defendants' actions until July 22, 1986.

## Discussion

Merrill Lynch and DiDomenico raise three issues in this motion. First, they contend that plaintiffs' Counts I, II, IV and X for violations of federal securities laws, common law fraud and RICO, should be dismissed for failure to plead fraud with particularity under Fed.R.Civ.P. 9(b). Secondly, they contend that plaintiffs' Count III under the Illinois Securities Law of 1953, Ill.Rev.Stat. ch. 121½, ¶ 137.12, should be dismissed for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6). Finally, defendants Merrill Lynch and DiDomenico contend that we must dismiss plaintiffs' RICO claim even if the fraud is alleged with sufficient particularity because it fails to adequately allege that defendants' actions constitute a "pattern of racketeering."

## Particularity

■ Merrill Lynch and DiDomenico argue that the securities fraud claims, the common law fraud claim and the RICO claim all fail to satisfy Rule 9(b), which

requires that "the circumstances constituting fraud ... shall be stated [in the complaint] with particularity." We disagree and hold that plaintiffs have satisfied Rule 9(b).

We focus on the securities fraud allegations because these also form the basis to the predicate acts necessary to state a RICO claim and because the common law fraud count is based on the same underlying facts. Rule 9(b) must be read in conjunction with the Rule 8(a) requirement of a short and plain statement of the cause of action. *Tomera v. Galt*, 511 F.2d 504, 508 (7th Cir.1975). The purpose of Rule 9(b) is threefold. First, the rule prevents the filing of complaints solely for the purpose of discovering unknown wrongs. Second, the rule protects potential defendants from unwarranted allegations harmful to their reputation. Third, the rule gives notice to defendants of the conduct complained of so they can prepare a defense. *Morgan v. Korbin Securities*, 649 F.Supp. 1023, 1028 (N.D.Ill.1986). In a securities fraud case, plaintiffs need only describe the outline of the fraudulent scheme and need not set forth facts which, because discovery has not been completed, are in the exclusive possession of defendants. *Id.* (citing *Banowitz v. State Exchange Bank*, 600 F.Supp. 1466, 1469 (N.D.Ill.1985)).[2] Plaintiff must at least specify the persons, contents and manner of communication of any alleged misrepresentation. However, with multiple defendants, a pleading is sufficient if it reasonably notifies each defendant of the part he or she plays in the scheme. *Adair v. Hunt International Resources Corp.*, 526 F.Supp. 736, 744 (N.D. Ill.1981). Defendants specifically complain that plaintiffs have failed to detail the over one hundred unauthorized transactions and the exact nature of DiDomenico's "assistance" in the execution of the unauthorized transactions. If this were a churning case, then there might be some need to itemize in detail each and every transaction, but this is not such a case. As to the exact nature of DiDomenico's assistance in the execu-

tion of the unauthorized trades, we think a fair inference to be made is that DiDomenico's assistance consisted of carrying out the specific transactions requested by James, with full knowledge that James was not authorized to order such transactions. The purchase of options on a brokerage account or the selling of stock out of such accounts is not a self-executing action. James may have wanted to purchase options, but without the assistance of someone at Merrill Lynch, the purchase would never have been consummated. Therefore, we find that, as to the nature of DiDomenico's assistance, plaintiffs have complied with Rule 9(b).

We also reject defendants' other allegations of inadequacies in plaintiffs' pleadings. Plaintiffs have adequately set out the outline of the fraudulent scheme. DiDomenico falsely told Michael that Merrill Lynch could only send out account notices to one person even though there was more than one person on the account. Because of this, Michael requested the statements be sent to his son James when he embarked upon a period of extensive traveling. DiDomenico and Merrill Lynch, knowing of James' propensity as a compulsive options gambler, encouraged James to engage in options trading on Michael's main account. DiDomenico and Merrill Lynch, also knowing that James was not authorized to sell any stock in the main account, assisted him in selling off the stock so that he could gamble the proceeds on options. Through this activity, DiDomenico and Merrill Lynch would earn commissions, commissions in excess of what they had been earning on Michael's account under Michael's conservative investment strategy. Then, when the funds in the main account were no longer sufficient to finance the continued gambling on options, Merrill Lynch and DiDomenico allowed James to transfer funds with forged documents from accounts he was not a signatory on, into the main account. In order to perpetuate this scheme to earn commissions, Merrill Lynch and

---

**2.** The pleading requirement for a churning claim under the federal securities law is more extensive. *See, e.g., Winkler v. Merrill Lynch,* *Pierce, Fenner & Smith, Inc.,* 642 F.Supp. 122, 125 (N.D.Ill.1986). This is not, however, a churning case.

DiDomenico made sure that all of the confirmation slips for this unauthorized activity were sent only to James, thus allowing the parties to conceal the activity in the accounts from the plaintiffs. Then, on the two occasions between January 1984 and July 22, 1986, when Michael spoke with DiDomenico, DiDomenico intentionally misled Michael to believe everything was fine with his account, that there had been no activity in the accounts and that the accounts remained intact.

The foregoing allegations adequately set forth a brief sketch of how the scheme operated, when and where (the Oakbrook Merrill Lynch Office) it operated and who the participants were. *Cornick v. Hi Grade Cleaners*, 595 F.Supp. 718, 721 (N.D.Ill.1984). Further specifics concerning the alleged fraudulent conduct may be readily acquired through discovery. *Id.*[3] Accordingly, Merrill Lynch and DiDomenico's motion to dismiss for failure to comply with Rule 9(b) is denied.

### Illinois Securities Law

■ Merrill Lynch and DiDomenico urge this Court to dismiss plaintiffs' Count III under the Illinois Securities Law of 1953, Ill.Rev.Stat. ch. 121½ ¶ 137.12 (West Supp. 1987), for failure to comply with the notice and tender requirements of the statute. Plaintiffs concede that this count, as currently pled, is inadequate and request leave to amend contending that they have in fact complied with the notice and tender requirements. We grant plaintiffs' request for leave to amend, pursuant to Fed.R. Civ.P. 15(a) ("leave shall be freely given when justice so requires.") Accordingly, defendants' motion to dismiss Count III is granted with leave to amend.[4]

### RICO Claim

Merrill Lynch and DiDomenico also move this Court to dismiss plaintiffs' Count X claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (West Supp. 1987), for failure to state a claim upon which relief can be granted. Defendants first contend that plaintiffs have failed to allege the necessary predicate acts to form the basis of a RICO claim because of the alleged failure to plead with particularity under Rule 9(b). As stated above, we found that plaintiffs have adequately pled their securities fraud claims and have, therefore, adequately pled the necessary predicate acts under RICO.

Merrill Lynch and DiDomenico next contend that plaintiffs have failed to allege the requisite "pattern of racketeering activity" necessary to state a claim under RICO. Section 1964 of RICO enables a private plaintiff to bring a civil suit based on a violation of § 1962. A key element of a § 1962 claim, however, is the existence of a pattern of racketeering. *See Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 818 (7th Cir.1987); *Marks v. Forster*, 811 F.2d 1108, 1110 (7th Cir.1987); *Elliott v. Chicago Motor Club Insurance*, 809 F.2d 347, 349 (7th Cir.1986); *Morgan v. Bank of Waukegan*, 804 F.2d 970, 974 (7th Cir. 1986); *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322, 323 (7th Cir.1986).

The Seventh Circuit has held that a "pattern" of racketeering means "predicate acts sufficiently separate in time that they may be viewed as separate transactions." *Skycom*, 813 F.2d at 818. In *Skycom*, the court held that supposedly fraudulent rep-

---

**3.** Defendants also challenge the allegations of mail fraud as predicate acts under the RICO claim. Because we find that plaintiffs have adequately alleged the existence of at least two separate predicate acts of securities fraud, we do not address the merits of defendants' claims as to the allegations of mail fraud.

**4.** Merrill Lynch and DiDomenico argue in their reply memorandum that plaintiffs' amendment will not satisfy the tender requirement of Ill. Rev.Stat. ch. 121½ ¶ 137.13 A. Because the complaint is not before the Court, we decline to

address defendants' contention at this juncture. We note, however, that plaintiffs indicated in their notice to defendants that the reason they did not tender the securities was because they never received the securities from the defendants. Apparently the purchased securities were held in a street name to facilitate their resale. The statute appears to address this particular situation quite clearly by providing for the tender of any contract made in respect to such sale in lieu of the actual securities. Ill.Rev.Stat. ch. 121½ ¶ 137.13 A.

resentations leading up to a single contract, and the transfer of a single business opportunity did not amount to a "pattern" of racketeering. *Id.* In *Marks*, the court found that, despite the allegation of multiple acts of mail fraud and multiple misrepresentations, the racketeering activity was designed to defraud one victim on one occasion and, therefore, did not amount to a pattern. *Marks*, 811 F.2d at 1111. In *Elliott*, the court held that multiple predicate acts of mail fraud which all related to the plaintiffs' attempt to settle one claim under their uninsured motorist insurance policy did not amount to a pattern. *Elliott*, 809 F.2d at 350. In *Lipin*, the court held that numerous misrepresentations made by mail all designed to defraud one victim on one occasion, the sale of a company, did not amount to a pattern. *Lipin*, 811 F.2d at 1110.

In contrast to the above cases, the court in *Morgan v. Bank of Waukegan* did find that plaintiffs had adequately alleged a pattern of racketeering. 804 F.2d at 976. The court, in reversing the lower court's dismissal of plaintiffs RICO count, rejected any requirement that the predicate acts must always occur as part of separate schemes. *Morgan*, 804 F.2d at 975. The court, instead, held that in "order to be sufficiently continuous to constitute a pattern of racketeering activity, the predicate acts must be ongoing over an identified period of time so that they can fairly be viewed as constituting separate transactions, *i.e.*, 'transactions "somewhat separated in time and place." ' " *Id.* (citations omitted). The court noted that the relevant factors to consider were (1) the number and variety of predicate acts; (2) the length of time over which they were committed; (3) the number of victims; (4) the presence of separate schemes; and (5) the occurrence of distinct injuries. *Id.* The court also made the following disclaimer:

> However, the mere fact that the predicate acts relate to the same overall scheme or involve the same victim does not mean that the acts automatically fail to satisfy the pattern requirement. The doctrinal requirement of a pattern of racketeering activity is a standard, not a rule, and as such its determination depends on the facts and circumstances of the particular case, with one factor being necessarily determinative.

*Id.* at 975–76.

█ Merrill Lynch and DiDomenico argue that in this case plaintiffs have only alleged the existence of one "scheme" that has resulted in one basic injury to one victim. We reject this characterization of the complaint. First, there is not just one victim; there are five victims, Michael, Gerald, Joan, Ann and Theresa Donato. Merrill Lynch and DiDomenico argue that just because these people are all related, they are not "separate victims."

Defendants also contend that, despite the over one-hundred unauthorized transactions, the forgery of documents and the intentional misrepresentations, there was only one basic injury. We disagree. First, defendants try to limit the alleged predicate acts to just the unauthorized transactions. However, in addition to the over one hundred unauthorized transactions on four different accounts, there was forgery, fraudulent misrepresentations and the manipulation of a known compulsive gambler to accomplish securities fraud. As for each of the over one hundred unauthorized transactions, each had, as we characterized it in *Ghouth v. Conticommodity Service, Inc.*, 642 F.Supp. 1325, 1337 (N.D.Ill.1986), "independent harmful significance." Each time there was an unauthorized purchase of options, unauthorized sale of stock and so on, the victims were harmed. No one can doubt that, if defendants had made only one unauthorized purchase of options and stopped, the harm to the victims would have been less than it was with the over one hundred unauthorized transactions. Although it is arguable that the forgeries, misrepresentations and manipulations were all acts which lacked independent harmful significance sufficient to be separate schemes with "distinct injuries," *see, e.g., Morgan*, 804 F.2d at 975, it is irrelevant where each of the unauthorized transactions created distinct injuries.

The predicate acts in this case were also sufficiently continuous as ongoing over a

year- to two-year period, sufficient to be viewed as constituting separate transactions, that is, transactions somewhat separated in time and place. *Morgan*, 804 F.2d at 975.

Accordingly, we find that plaintiffs have adequately alleged a "pattern" of racketeering sufficient to survive a motion to dismiss.

### Motion To Stay Pending Arbitration

■ Defendants Merrill Lynch and Di-Domenico initially contended that we must stay this action pending arbitration of plaintiffs' claims pursuant to a "Standard Option Agreement Individual and Joint Accounts Only" ("Exhibit A"), allegedly signed by James, Gerald and Michael Donato. However, Gerald and Michael, by way of affidavits attached to their response, contend that their signatures on Exhibit A were forged. Claiming that this was the first defendants knew of this alleged forgery, defendants request that we order a trial on the sole issue of whether this agreement was forged.

We now know that claims under § 10(b) of the Securities Exchange Act of 1934, S.E.C. Rule 10b–5, and under RICO are arbitrable pursuant to a valid agreement to arbitrate. *Shearson/American Express Inc. v. McMahon*, — U.S. —, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). Thus, if the document at issue is a valid document, then such claims must be submitted to arbitration.

Before proceeding further with this case, we must determine whether the document was indeed forged. We will submit the issue of forgery to a full trial on the merits only if defendants can discover sufficient evidence to rebut plaintiffs' sworn statements that they did not execute the document authorizing arbitration. Because of the nature of the allegations, we may be able to decide this issue on summary judgment.

Even if defendants are successful in proving that Michael and Gerald executed Exhibit A, we find that the following issues must still be resolved before we will order this case stayed pending arbitration:

(1) whether the claims of Joan and Theresa Donato can be stayed where neither signed the arbitration agreement;

(2) whether all plaintiffs' claims under § 17(a) of the 1933 Securities Act may also be arbitrated; and

(3) to what claims does the arbitration document apply when it limits itself to "[a]ny controversy between us arising out of such option transaction or this agreement ..." when some of the claims do not relate specifically to option transactions. Additionally, we must determine whether this question should be decided by this Court or by the arbitrator.

We make one final observation regarding the hearing/trial on the issue of forgery. Fed.R.Civ.P. 11 requires that lawyers must, *before* filing any pleadings, motions or other papers, make a reasonable inquiry to determine whether it is "well grounded in fact and is warranted by existing law...." It is apparent that defendants did not comply with this rule at the time they filed their motion to stay this suit pending arbitration. Their motion was based on a document allegedly executed during the period set forth in the complaint as the period when James Donato, with the assistance of defendants, forged all documents needed to authorize his options gambling. This by itself should have alerted defendants to the possibility that Exhibit A had also been forged. Yet, defendants admit they did not know of plaintiffs' contention that this document was forged until after they filed the motion to stay. We find that if defendants had made a reasonable inquiry prior to filing their motion to stay they would have known of the alleged forgery. Although we reserve the question of whether to assess sanctions to a later date, we suggest to Merrill Lynch and DiDomenico and their attorneys that any further failure to comply with Rule 11 will not be tolerated. Thus, when conducting discovery to determine whether the arbitration agreement was indeed forged, defendants should only proceed to the summary judgment or trial stage on the issue of

forgery if their position is "well grounded in fact."

Because plaintiffs have raised a factual issue regarding the existence of an arbitration agreement signed by them, the parties are directed to prepare an expedited discovery schedule on this issue for presentation to the Court at a status hearing on June 30, 1987, at 10:00 a.m.

In conclusion, we find that plaintiffs have complied with Fed.R.Civ.P. 9(b), and we therefore deny Merrill Lynch and DiDomenico's motion to dismiss on that basis. Because plaintiffs have failed to allege the requisite notice and tender required for their claim under Ill.Rev.Stat. ch. 121½ ¶ 137.12, we grant defendants' motion to dismiss Count III, but do so with leave to amend. Finally, because plaintiffs have adequately alleged a "pattern" of racketeering, we deny defendants' motion to dismiss plaintiffs' Count X. Also, as discussed above, we will proceed to a summary disposition of the forgery issue prior to entering a stay pending arbitration. It is so ordered.